IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GLENCORE  LTD. | § | |
| | § | |
| *vs*. | § | C. A. NO. H – 11 – 3070 |
| | § | |
| OCCIDENTAL  ARGENTINA | § | |
| EXPLORATION  AND | § | |
| PRODUCTION,  INC. | § | |

## *PLAINTIFF'S  OPPOSED  MOTION  FOR  ALTERNATIVE  SERVICE*

TO THE HONORABLE KEITH P. ELLISON:

Plaintiff Glencore Ltd. ("Glencore") respectfully files and serves this motion for an order under Federal Rule 4(f)(3) authorizing it to serve process on Defendant Occidental Argentina Exploration and Production, Inc. ("Occidental Argentina") by serving Occidental Argentina's Houston counsel and/or its contractual notice parties in Houston, Occidental Crude Sales, Inc. and Occidental Energy Marketing, Inc.

### *Background*

1.     Glencore seeks to recover demurrage owed by Occidental Argentina for delays in loading a shipment of crude oil.  On October 6, 2011, Glencore delivered the summons and Original Complaint to the address specified for notices in the sales contract between the parties.

2.      On January 6, 2012, Occidental Argentina filed its Rule 12(b)(5) motion to dismiss for insufficient service of process.  Occidental Argentina did not move to dismiss for lack of personal jurisdiction.  By Memorandum and Order dated February 22, 2012, the Court retained this case but quashed service, finding that the parties' contract did not provide an alternative method for service or designate a domestic agent to accept service.  The Memorandum and Order granted Glencore "thirty (30) days in which to serve Defendant properly pursuant to the Federal Rules of Civil Procedure."

3.      Occidental Argentina alleges that it is a foreign business corporation based in Buenos Aires, Argentina, and maintains no place of business in Texas.  Glencore has been unable to locate Occidental Argentina within the jurisdiction other than through its contractual notice parties in Houston.

4.      Occidental Argentina does not dispute that it received actual notice of the suit or that it is subject to the Court's personal jurisdiction.  Nor does Occidental Argentina dispute that the parties' contract required Glencore to give written notice of demurrage claims to Occidental Argentina's corporate affiliates in Houston, Occidental Crude Sales, Inc., and Occidental Energy Marketing, Inc.  (Exh. A at 7, 10)

### *Argument:  Alternative Service Upon Occidental Argentina's Houston Counsel Is Warranted And Comports With Due Process*

*Given its actual notice of this action and submission to the jurisdiction, service on Occidental Argentina abroad – rather than through its contacts in Houston – will cause needless burden, delay and extra expense.*

5.     Rule 4(f) allows several methods for service relevant here.  Service under 4(f)(1) or (f)(2), however, would constitute an unnecessarily burdensome and costly exercise since Occidental Argentina already has notice of the action and has hired a local attorney.   Service under Rule 4(f)(3) offers a more efficient and economical method of service, and accords with due process.

6.     Rule 4(h) governs service on a corporation or other business entity, and states: "Unless federal law provides otherwise or the defendant's waiver has been filed, a domestic or foreign corporation . . . must be served . . . at a place not within any judicial district of the United States, in a manner prescribed by Rule 4(f)[1]

---

[1] Rule 4(f), entitled "Serving an Individual in a Foreign Country" states:

Unless federal law provides otherwise, an individual – other than a minor, an incompetent person, or a person whose waiver has been filed – may be served at a place not within any judicial district of the United States:

    (1)  by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

    (2)  if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

        (A)  as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

        (B)  as the foreign authority directs in response to a letter rogatory or letter of request; or

        (C)  unless prohibited by the foreign country's law, by:

            (i)   delivering a copy of the summons and of the complaint to the individual personally; or

            (ii)  using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

    (3)  by other means not prohibited by international agreement, as the court orders.

3

for serving an individual, except personal delivery under (f)(2)(C)(i)." FED. R. CIV. P. 4(h)(2).

7.     Rule 4(f)(1) permits service abroad by internationally agreed means. The United States and Argentina are both signatories to The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("The Hague Convention"). *See* Status Table for the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, http://www.hcch.net/index_en.php?act=conventions.status&cid=17 (last visited Mar. 9, 2012).  The Hague Convention's Article 5 provides the default method for service of process, in which the destination country's designated Central Authority receives process from the plaintiff and arranges for service on a defendant.  *See* The Hague Convention on the Service Abroad of Judicial and Extra–Judicial Documents in Civil or Commercial Matters Art. 5, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163.  That procedure likely would exceed the thirty day period allowed by the Court's February 22, 2012 order and, reportedly, could take several months to accomplish.  *See, e.g.*, *Maale v. Francis*, 258 F.R.D. 533, 535–36 (S.D.Fla. 2009) (entity plaintiff hired to perfect service through Argentina's Central Authority pursuant to the Hague

---

FED. R. CIV. P. 4(f).

Convention reported "service and return of proof of service in accordance with the Hague Convention generally takes 6 months or longer . . . .").

8.     The Hague Convention's Article 10 permits three alternative service methods that avoid proceeding through a Central Authority, including direct mail and service through an agent, "[p]rovided the State of destination does not object . . . ."[2] Because Argentina has objected to Article 10, however, these alternative methods are prohibited for service on any Argentine entity.  *See* Declarations and Reservations of the                             Argentine                             Republic, http://www.hcch.net/index_en.php?act=status.comment&csid=389&disp=resdn   (last visited Mar. 9, 2012).  Further, the Fifth Circuit holds that "the Hague Convention does not permit service by mail."  *Nuovo Pignone v. Storman Asia M//V*, 310 F.3d 374, 384 (5th Cir. 2002).

9.     The Rule 4(f)(2) service options also are unavailable.  Rule 4(f)(2) provides alternative forms of service "if there is no internationally agreed means, or if an international agreement allows but does not specify other means . . . "  FED. R.

---

[2] Article 10 provides:
> Provided the State of destination does not object, the present Convention shall not interfere with –
> (a)  the freedom to send judicial documents, by postal channels, directly to persons abroad,
> (b)  the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
> (c)  the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

The Hague Convention, art. 10, 5, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163

CIV. P. 4(f)(2).  "Compliance with the [Hague] Convention is mandatory in all cases to which it applies."  *Volkwagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988).  The Hague Convention applies "in all cases . . . where there is occasion to transmit a judicial or extrajudicial document for service abroad."  *Id.*  (quoting Hague Convention art. 1, 20 U.S.T., at 362).  Thus, Rule 4(f)(2), along with Argentina's objections and the rules in *Nuovo* and *Schlunk*, limit Glencore's options for service under 4(f)(1) to the costly, time–consuming service of translated process through Argentina's Central Authority.  By contrast, Rule 4(f)(3) provides this Court with discretion to authorize a more cost–efficient and prompt manner of service, particularly where, as here, the defendant is subject to personal jurisdiction in the district and service accords with due process.

*Service on Occidental Argentina's counsel comports with international law.*

10.     Rule 4(f)(3) permits the Court to order alternative service "not prohibited by international agreement . . . ."  FED. R. CIV. P. 4(f)(2).  The federal courts have recognized that the Hague Convention does not prohibit service on a foreign defendant's local counsel.  *See, e.g.*, *RSM Production Corp. v. Fridman*, 06 Civ. 11512, 2007 WL 2295907, at *3-4 (S.D.N.Y. Aug. 10, 2007); *FMAC Loan Receivables v. Dagra*, 228 F.R.D. 531, 534 (E.D.Va. 2005).  "Where service on a domestic agent is valid and complete under both [governing authority] and the Due Process Clause, our inquiry ends and the Convention has no further implications."

6

*Dagra*, 228 F.R.D. at 534 (quoting *Schlunk*, 486 U.S. at 707).  The Hague Convention does not bar service on local counsel in Houston because such service does not constitute an occasion to transmit judicial documents abroad.  *Id.*  ("Since service is being requested on defense counsel, whose office is located in Richmond, Virginia, the Hague Convention does not apply.  Thus, the means of service requested does not conflict with the requirements of Rule 4(f)(3)."); *see also RSM*, 2007 WL 2295907, at *3–4 (permitting service on a Russian resident through his local counsel despite Russia's objections to the Hague Convention's Article 10 and holding "The Hague Service Convention does not prohibit an order pursuant to Rule 4(f)(3) permitting service through American counsel.").

<u>*Rule 4(f)(3) is independent of Rule 4(f)'s other service methods.*</u>

11.    "The decision to allow alternative methods of service under Rule 4(f)(3) is committed to the court's 'sound discretion.'"  *Nabulsi v. H.H. Sheikh Issa Bin Zayed Al Nahyan*, No. H–06–2683, 2007 WL 2964817, at *4 (S.D.Tex. Oct. 9, 2007) (quoting *Rio Props, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002)).  As this Court has observed:  "Rule 4(f) does not denote any hierarchy or preference for one method of service over another, and 'service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief [but, instead,] . . . merely one means among several which enables service of process on an international defendant . . . .'"  *Id.* (quoting *Rio Props., Inc.*, 284 F.3d at 1015).  Thus, Glencore may seek alternative

service under Rule 4(f)(3) before attempting other methods in Rule 4(f).  *See Dagra*, 228 F.R.D. at 534 (ordering service on foreign defendant's local counsel and noting that "a party 'need not have attempted every permissible means of service of process before petitioning the court for alternative relief.'") (quoting *Rio Props., Inc.*, 284 F.3d at 1016).

*Service on Occidental Argentina's local counsel will satisfy due process.*

12.     Service under Rule 4(f)(3) must comply with Constitutional notions of due process by being "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Dagra*, 228 F.R.D. at 534 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  There can be no question in this case that service on Occidental Argentina's local counsel apprises Occidental Argentina of the pendency of the action and, thus, comports with due process.

13.     Occidental Argentina's Houston counsel already has submitted a motion and other filings on its behalf.  *See, e.g., Dagra*, 228 F.R.D. at 534–35 (holding that the foreign defendant would be given proper notice by service on his attorney: "The numerous motions filed by [defendant's] attorney . . . make it abundantly clear that [defendant] has been in constant communications with his attorney."); *see also U.S. Commodity Futures Trading Comm'n v. Aliaga*, 272 F.R.D. 617, 620–21 (S.D.Fla. 2011) (granting alternative service by email and service on local counsel, noting: "It is

8

undisputed that [defendants' local counsel] filed a Motion to Dismiss on behalf of the Defendants.   Presumably, he did so with their authorization after some communication with Defendants."); *Levin v. Ruby Trading Corp.*, 248 F.Supp. 537, 543 (S.D.N.Y 1965) (Weinfeld, J.) (authorizing service on defendant's attorneys and stating: "A party is not to be denied his day in court to prove his claim against one allegedly liable to him except upon a substantial showing of injustice to the adversary. [Defendant] has received fair notice of this suit, of which he has been aware since its commencement."); *cf. Prost Holdings, Inc. v. Kagan*, 2:11–cv–238, 2012 WL 194388, at *2–3 (E.D.Tex. Jan. 23, 2012) (ordering alternative service by email and registered mail on defendant's foreign counsel and noting that "[s]ervice on an attorney by ordinary mail may also satisfy the due–process requirements of Rule 4(f)(3)."). Occidental Argentina does not and cannot dispute that it already has actual notice of this suit.

14.    Occidental Argentina's objections to service demonstrate that it had sufficient opportunity to present such objections.  *See, e.g.*, *Dagra*, 228 F.R.D. at 535 ("It is also reasonable to infer in light of the numerous challenges that [defendant] has made in his defense that he already has sufficient notice of the case.").  Glencore asked Occidental Argentina whether it would waive service, or whether it was willing to have its counsel accept service.  Occidental Argentina refused the request, insisting that service be performed through the Hague Convention.

*Rule 4(f)(3) service is warranted because Occidental Argentina already has submitted to the Court's personal jurisdiction.*

15.    No due process considerations exist to warrant the delay and cost of service abroad because Occidental Argentina has submitted to the Court's jurisdiction. Occidental Argentina waived any objection to personal jurisdiction when it filed its motion to dismiss and did not contest personal jurisdiction under Rule 12(b)(2).

16.    Rule 12(g)(2) states, "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  FED. R. CIV. P. 12(g)(2).  Under Rule 12(h)(1)(A), "[a] party waives any defense listed in Rule 12(b)(2)-(5) by: (a) omitting it from a motion in the circumstances described in Rule 12(g)(2) . . . ."  FED. R. CIV. P. 12(h)(1)(A); *see also* HON. DAVID HITTNER ET AL., PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL, 5TH CIRCUIT EDITION § 5:332 (2011) ("[i]f *any* Rule 12 motion is made, defendant's failure to join with it a motion for challenging personal jurisdiction or process *waives* the defect . . . ." (emphasis in original) (citing *Golden v. Cox Furniture Mfg. Co., Inc.*, 683 F.2d 115, 118 (5th Cir. 1982)); *Albany Ins. Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 909 (5th Cir. 1993) (construing Rule 12 to hold: "If a party seeks dismissal in a pretrial motion based on . . . Rule 12(b), he must include in such motion any other defense or objection then available which Rule 12 permits . . . .  If

10

the party omits such defense or objection, Rule(g) precludes him from making a further motion seeking dismissal based on the omitted defense or objection.").

17.   In *MCW, Inc. v. Badbusinessbureau.com L.L.C.*, Civ.A.3:02–CV–2727– G, 2004 WL 833595, at *4 (N.D.Tex. Apr. 19, 2004), for example, the district court held that the defendant had waived its right to contest personal jurisdiction when it omitted that defense from its first Rule 12(b) motion.  In so holding, the court stated: "[R]aising the issue of personal jurisdiction telephonically during oral argument of the Rule 12(b)(5) motion does not rescue [Defendant]."  *Id*.  Courts in other circuits similarly have held that a defendant waives objection to personal jurisdiction under Rule 12(b)(2) if that objection is not included with an earlier Rule 12(b)(5) motion to dismiss for insufficient service of process.  *See, e.g.*, *Boston Telecomms. Group, Inc. v. Deloitte Touche Tohmatsu*, 249 Fed.Appx. 534, 536–37 (9th Cir. 2007) (holding foreign defendant waived any Rule 12(b)(2) personal jurisdiction defense by failing to include it along with his initial Rule 12(b)(5) motion); *Balachander v. NCL (Bahamas) Ltd.*, 800 F.Supp.2d 1196, 1200 (S.D.Fla. 2011) ("[Defendant] waived the defense of personal jurisdiction by failing to raise it when he raised insufficiency of service of process as a defense."); *Frye v. Ulrich GMBH & Co. KG*, No. 3:08–cv– 158–MEF, 2010 WL 3172167, at *1 (M.D.Ala. Aug. 11, 2010) ("[Defendant] filed a Rule 12(b)(5) motion to quash service of process and failed to object to personal

jurisdiction in that motion.  Therefore, according to the plain language of Rules 12(g)(2) and 12(h)(1), [Defendant] has waived its personal jurisdiction defense.").

18.    The parties' contract required Glencore to give written notice of demurrage claims to Occidental Argentina through its local Houston affiliates: Occidental Crude Sales, Inc., and Occidental Energy Marketing, Inc.  (Exh. A at 7, 10)   Accordingly, Occidental Argentina contractually consented to receive claim notices in this district.  Given its presence for jurisdictional purposes, Occidental Argentina should not be permitted unnecessarily to delay the proceedings or increase the costs associated with proper service by insisting on service in a foreign country under the Hague Convention.  Additionally, Glencore's request for alternative service furthers an overarching purpose of the Federal Rules:  "[The Rules] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."  FED. R. CIV. P. 1.

## Conclusion  and  Prayer

19.    For the above reasons, Glencore respectfully asks the Court to order an alternative means of service under Federal Rule of Civil Procedure 4(f)(3), and authorize that service by email, fax or hand delivery to: (a) Occidental Argentina's Houston counsel, (b) Occidental Crude Sales, Inc. and (c) Occidental Energy Marketing, Inc.

20.    As the Court's order dated February 22, 2012 provides that service be made within thirty (30) days, expiring on March 23, 2012, Glencore respectfully requests an additional thirty day period in which to so serve Occidental Argentina.

Respectfully submitted,

*SHARPE & OLIVER, L.L.P.*

By_____

Robert C. Oliver
State Bar No. 15255700
S. D. Texas No. 886
550 Westcott, Suite 230
Houston, Texas 77007–5096
Telephone:       (713) 864–2221
Facsimile:       (713) 864–2228

OF COUNSEL:

R. M. Sharpe, Jr.
State Bar No. 18129000
S. D. Texas No. 889

ATTORNEYS   FOR   PLAINTIFF

13

## *Certificate of Conference*

I consulted with counsel for Defendant by email on March 9, 2012 and March 12, 2012.  Because counsel did not state whether Defendant opposes this motion, Plaintiff assumes it to be opposed.  Plaintiff will amend this certificate of conference if and when Defendant advises that it is not opposed to the granting of this motion.

_____
Robert C. Oliver

## *Certificate of Service*

I served this motion upon Defendant by its counsel of record by CM/ECF on March 12, 2012.

_____
Robert C. Oliver

14

# Exhibit A

# GENERAL TERMS AND CONDITIONS

## F.O.B. SALES

OCCIDENTAL CRUDE SALES, INC. (INTERNATIONAL)

January 1995

## **TABLE OF CONTENTS**

1 – DELIVERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

2 – TITLE AND RISK OF LOSS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

3 – MEASUREMENT AND TESTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

4 – NOMINATION OF VESSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

5 – EXPORT TERMINAL AND BERTH(S) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

6 – DESTINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

7 – FINANCIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

8 – DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

9 – LIQUIDATION OR DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

10 – ASSIGNABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

11 – FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

12 – NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

13 – NO WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

14 – GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

15 – HEADINGS NOT CONTROLLING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

16 – LETTER OF INDEMNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

17 – CONFLICT OF TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

18 – DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

**GENERAL TERMS AND CONDITIONS**
**F.O.B. SALES**

Occidental Crude Sales, Inc. (International)

**1 – DELIVERY**

Seller shall deliver, or cause to be delivered, the oil to the Buyer in full cargo lots, or in substantial part cargo lots, as mutually agreed, on board a vessel provided by Buyer at the export terminal.

**2 – TITLE AND RISK OF LOSS**

Title to and risk of loss of or damage to all oil delivered and sold hereunder shall pass to Buyer when the oil passes the vessel's permanent hose connection at the export terminal.  Any loss of or damage to the oil or to any property of Seller or export terminal operator and the consequences of oil pollution at the export terminal before, during or after loading that is caused through the fault of the vessel or its crew shall be for Buyer's account.

**3 – MEASUREMENT AND TESTING**

3.1     Quantity and Quality Determination

Quantity and quality of the oil delivered hereunder shall be determined by the mutually agreed to independent inspector from short tanks at loading port in accordance with the usual practice at the export terminal, and shall issue certificates establishing the quantity and quality of the oil delivered.

3.2     Inspection

Buyer and Seller shall mutually agree to an independent inspector prior to the commencement of loading, at the export terminal for the purpose of verifying quantity and quality  for the purposes of the custody transfer between buyer and seller.  All charges for such inspection shall be shared equally between Buyer and Seller.

The certificates issued by the independent inspector, with the approval of the export terminal operator, as appropriate, shall be final and binding for all purposes hereunder, unless (a) there is a disagreement based upon the independent inspector's findings and (b) a written protest has been delivered by the Buyer to the appropriate party within forty-five (45) days after Bill of Lading date.

3.3     Quantity and Quality Claims

Claims regarding the quantity and quality of oil delivered hereunder shall be waived by the Buyer unless (a) a protest was made in accordance with Section 3.2 above and (b) all such claims are made in writing, with all details then available to Buyer, to the Seller within forty-five (45) days after the date of the bill of lading.  No such claim shall exceed the purchase price of the oil as set out in this Agreement.

3.4     Specifications

The quality of the oil shall be the usual export quality being sold by the Seller at the time and place of delivery, unless specifications are prescribed elsewhere in this Agreement, in which case such specifications represent the only quality characteristics which the oil is required to meet.  **THERE ARE NO GUARANTEES OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS OR SUITABILITY OF THE OIL FOR ANY**

PARTICULAR PURPOSE, OR OTHERWISE, WHICH EXTEND BEYOND THE DESCRIPTION OF THE OIL IN THIS AGREEMENT.

## 4 - NOMINATION OF VESSEL

4.1    Nominations

Each vessel which is to load hereunder shall be nominated by a notice in writing to the Seller from the Buyer and accepted in writing by the Seller to the Buyer in accordance with this Agreement.  Such notice shall include, but not be limited to:

(a)    the name of the vessel, however, the designation TBN may be used, provided that the Buyer notifies the Seller in writing of the name of the vessel not less than five (5) days prior to the first day of the agreed loading range, as specified in this Agreement;

(b)    the grade and quantity of the oil to be loaded, which quantity may not subsequently be altered by more than five percent (5%), plus or minus, without the prior written consent of the Buyer;

(c)    the name of the discharge port or ports;

(d)    the estimated date and time of arrival ("ETA") of the vessel at the export terminal; and

(e)    the vessel's flag, summer deadweight tonnage, length, beam and draft.

The notice of nomination shall be received by the Seller at the export terminal at least ten (10) days prior to the first day of the agreed loading range.  Seller shall accept or reject the Buyer's proposed vessel within seventy-two (72) hours of receipt of the nomination or within twenty-four (24) hours of receipt of the name of the vessel in the event of a TBN nomination initially.  Seller's acceptance shall not be unreasonably withheld.  In the event Buyer's proposed vessel is not accepted, Buyer shall immediately nominate another vessel to Seller.

4.2    Documentation Instructions

At least five (5) days prior to the first day of the agreed loading range, the Buyer shall provide any information which may be required or requested for the preparation and disposition of  bills of lading and other cargo documents by the Seller or export terminal operator.  Buyer shall be liable for any costs resulting from delays at the export terminal due to failure of the Buyer to supply such information in a timely manner.

4.3    Substitution of Vessel

With respect to any vessel named in the notice of nomination, the Buyer shall be entitled to substitute another vessel provided that:

(a)    the substitute vessel is acceptable to the Seller, whose acceptance shall not be unreasonably withheld;

(b)    the physical dimensions of the substitute vessel conform with the limitations of the export terminal and the quantity of the oil to be loaded remains unchanged from the quantity specified in the notice of nomination, unless such quantity is changed with the prior written consent of the Seller;

(c)     the agreed loading range which would have applied in respect of the vessel originally nominated shall apply to the substitute vessel; and

(d)     the Buyer shall give to the Seller notice in writing of the name, the position, the scheduled date of arrival and the other appropriate data of the substitute vessel, as required under Section 4.1 above, not less than three (3) days  before the ETA of the substitute vessel or three (3) days before the agreed loading range of the vessel originally nominated, whichever is the earlier, if practicable.  Seller shall accept or reject the Buyer's substitute vessel within twenty-four (24) hours of receipt of the notice of substitution.

## 5 - EXPORT TERMINAL AND BERTH(S)

5.1     <u>Berth</u>

Seller shall provide, or cause to be provided, a safe berth, free of charge, at the export terminal where a nominated vessel can lie, load, and depart always safely afloat.  If the Seller requires a shift in berth, costs thereof shall be for the Seller's account and time spent in shifting shall count as used laytime.  If Buyer's vessel requires a shift in berth, costs thereof shall be for the Buyer's account and time spent in shifting shall not count as used laytime.

5.2     <u>Loading Conditions</u>

5.2.1.  <u>Vessel Arrival Notices</u>

Buyer shall notify the export terminal operator at the export terminal, of the expected hour of arrival of the nominated vessel approximately seventy-two (72), forty-eight (48) and twenty-four (24) hours before arrival thereat.   Any delays resulting from a failure to give the twenty-four (24) hour advance notice of arrival shall not count as laytime or, if the vessel is on demurrage, as time on demurrage.  After the vessel has arrived at the customary anchorage or waiting place at the export terminal and is fit and ready to load, the Buyer shall provide the export terminal operator at the export terminal with a notice of readiness (NOR) by letter, telex, telegraph, radio or telephone.  If by radio or telephone, the NOR shall be subsequently confirmed promptly in writing of the vessel's readiness to load cargo, berth or no berth.

5.2.2   <u>Allowed Laytime</u>

The time allowed to the Seller for the loading of the cargo of oil hereunder shall be thirty-six (36) running hours.

5.2.3   <u>Commencement of Laytime</u>

Subject to the provisions of this Agreement, and provided that the Buyer has complied with the ETA reporting procedure of the export terminal, if the NOR to load is tendered:

(a)     within the agreed loading range, then laytime shall commence six (6) hours after the NOR is tendered by the master to the export terminal operator or when the vessel is all fast at the loading berth, whichever is earlier; or

(b)     prior to the first day of the agreed loading range, then laytime shall commence at 0600 hours on the first day of such loading range or when the vessel is all fast at the loading berth, whichever is earlier; or

(c)     after the last day of the agreed loading range, then laytime shall commence on commencement of loading.

### 5.2.4     Laytime Exclusions

Any time used for any of the following purposes or reasons shall not be counted or included in calculating used laytime or, if the vessel is on demurrage, as time on demurrage:

(a)     awaiting customs and immigration clearance, pratique, tugs, tide, pilot or daylight;

(b)     inward passage until the vessel is securely moored at the berth or other loading place;

(c)     discharge of ballast to the extent that this is not accomplished concurrently with loading operations;

(d)     restrictions imposed by the Buyer, the owners or the master of vessel, or governmental authorities;

(e)     vessel's breakdown or failure to comply with the regulations or requirements of the export terminal with respect to equipment aboard, causing delay or restriction to loading operations;

(f)     cleaning and inspection of the vessel's cargo tanks;

(g)     time spent complying with any of the laws, regulations and other requirements referred to in Section 5.5, Regulations at Export Terminal; and

(h)     any delay in loading directly attributable to either fire or the breakdown of machinery or equipment at the export terminal or to strikes or labor disturbances at the export terminal, but only to the extent of one-half (1/2) of such time.

### 5.2.5     Weather

Any delay to the vessel after the expiration of six (6) hours from the tender of the NOR before arrival at the loading berth or any delay to the vessel after arrival at the loading berth due to weather and/or sea conditions resulting in closure of the export terminal by the local authorities, or the export terminal operator, shall count as used laytime, however, only to the extent of one-half (1/2) of such time.

### 5.2.6     Laytime to Cease

Laytime shall cease upon disconnection of the loading hoses after the completion of loading.

### 5.3     Demurrage

5.3.1   Seller's Liability

If the laytime used exceeds the laytime allowed, the Seller shall pay demurrage, in U.S. dollars, to the Buyer in respect of the excess time at the appropriate rate per day or any pro rata part thereof.

5.3.2   Demurrage Rate

The rate of demurrage to be used hereunder for all vessels that are owned or time chartered by the Buyer shall be the single voyage market level current in London on the date of commencement of loading of the voyage concerned for a vessel of similar type and summer deadweight as the vessel actually involved in the loading hereunder.   Such voyage market level shall be expressed in percentage points of Worldwide Tanker Nominal Freight Scale (Worldscale), as amended from time to time, or such other freight scale as may be issued in replacement thereof, and applied to the demurrage rate appropriate to the size of the vessel involved, as provided for in the aforementioned freight scale.  In the absence of agreement between the Seller and the Buyer on the voyage market level, E.A.  Gibson Shipbrokers, Ltd., P.O. Box 278, Audrey House, 16/20 Ely Place, London ECIP 1HP, shall be requested to determine the voyage market level of demurrage for this purpose hereunder.  The rate of demurrage to be used hereunder for all vessels that are single voyage chartered by the Buyer shall be the rate as specified in the charter party.  Buyer shall only be entitled to recover demurrage from the Seller to the extent that the Seller is able to recover such demurrage from Seller's supplier.

5.3.3   Demurrage Claims

**IN NO EVENT SHALL THE SELLER BE LIABLE FOR DEMURRAGE HEREUNDER UNLESS THE DEMURRAGE CLAIM HAS BEEN SUBMITTED BY THE BUYER IN WRITING WITHIN SIXTY (60) DAYS AFTER THE DATE OF COMPLETION OF LOADING, STATING IN REASONABLE DETAIL THE SPECIFIC FACTS ON WHICH SUCH CLAIM IS BASED.  IF THE SELLER SHALL BECOME LIABLE TO THE BUYER FOR DEMURRAGE HEREUNDER, THE SELLER SHALL NOT BE LIABLE FOR ANY OTHER DAMAGES, DIRECT, CONSEQUENTIAL OR INDIRECT, ARISING OUT OF THE CIRCUMSTANCES WHICH CAUSED THE DEMURRAGE LIABILITY.**

5.4   Lightering

Lightering of the vessel shall be at the expense and risk of the Buyer, unless such lightering is required solely by the Seller, or the export terminal operator, because an adequate berth is not available to the Buyer's vessel when such vessel has been accepted by the Seller.  In such case, lightering shall be at the expense and risk of the Seller or as per written  agreement between Buyer and Seller.

5.5   Regulations at Export Terminal

Buyer's vessel shall comply with all applicable laws, regulations, rules, and ordinances in effect at the export terminal and shall be enrolled in the Tanker Owners Voluntary Agreement Concerning Liability for Oil Pollution (TOVALOP), which came into effect October 6, 1969, as amended from time to time, or have equivalent oil pollution insurance

coverage.  All oil loaded on such vessel shall be insured by the Buyer and all other cargo interests under the Contract Regarding a Supplement to Tanker Liability for Oil Pollution (CRISTAL), dated January 14, 1971, as amended from time to time, or have equivalent oil pollution insurance coverage.  Notwithstanding anything to the contrary expressed in this Agreement, the Seller shall not be liable for the consequences of rejection of the Buyer's vessel by virtue of the application of such regulations or other requirements.

5.6     Taxes, Dues and Charges

Buyer shall be responsible for payment of all fees, customs, customs overtime and other similar port charges and all port dues and taxes levied against the vessel at the export terminal.

## 6 - DESTINATION

6.1     Restrictions

Buyer agrees that the oil purchased under this Agreement shall not be shipped to or through any country contrary to the laws of the country where the oil was produced, as such laws are in effect at the time of loading hereunder.

6.2     Certification

Buyer shall, if the Seller's supplier, or the export terminal operator at the export terminal so requires, provided appropriate documentation for the purpose of verifying the final destination of any oil sold hereunder.

## - FINANCIAL

7.1     Payment

Payment for the net bill of lading quantity, in barrels, of each cargo sold and delivered hereunder shall be made by the Buyer in immediately available U.S. dollars by wire transfer as directed in the Seller's invoice, without discount, deduction or counterclaim of any kind whatsoever, thirty (30) days after the date of the bill of lading relating to such cargo.  Any invoiced amount or portion thereof outstanding after the due date shall bear interest at a rate per annum equal to the lesser of (a) the prime rate quoted by Citibank N.A., New York, New York, at close of business on such due date, plus two (2) percentage points or (b) the maximum rate of interest allowed under applicable law. Such interest shall be compounded on a daily basis until the outstanding amount due is received.

7.2     Letter of Credit

Seller may, at its sole option, anytime prior to twelve (12) days before the first day of the agreed loading range hereunder, require the Buyer to establish an irrevocable letter of credit in favor of the Seller for the estimated amount of the purchase price of such nominated cargo plus ten percent (10%).  The letter of credit shall be (a) established in a form acceptable to the Seller, (b) at the sole cost of the Buyer, (c) opened with a bank acceptable to the Seller, (d) furnished to the Seller at least ten (10) days prior to the first day of the agreed loading range and (e) valid for at least sixty (60) days after the first day of the agreed loading range.  In no event shall the Seller be obligated to commence loading of any cargo hereunder until such letter of credit is provided to the Seller which meets the requirements of (a) through (e) above, and Seller, may at its sole option, terminate this Agreement with no liability if such letter of credit meeting the requirements

of (a) through (e) above is not provided to the Seller within the time periods set forth above.  Any delays and any costs associated with such delays shall be for the Buyer's account, without prejudice to any other rights or remedies which the Seller may have.

7.3   Split Weekend Rule

If payment hereunder is due on a Saturday or a bank holiday other than a Monday, in the location where payment is to be made, payment shall be made on the preceding business day.  If payment is due on a Sunday or a Monday bank holiday, then payment shall be made on the following business day.

## 8 - DAMAGES

**EXCEPT AS MAY BE EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER THE SLLER NOR THE BUYER SHALL BE LIABLE FOR, AND NO CLAIM SHALL BE MADE FOR, CONSEQUENTIAL, INDIRECT, OR SPECIAL DAMAGES OF ANY KIND ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THE PERFORMANCE OF OR THE FAILURE TO PERFORM THIS AGREEMENT.**

## 9 – LIQUIDATION OR DEFAULT

9.1 Seller, without prejudice to any other rights or remedies available to it by law or otherwise, may terminate this Agreement by giving the Buyer notice in writing in the even that:

(a)   a liquidator, trustee in bankruptcy or receiver is appointed in respect of the assets of the Buyer, or any of its associated companies, or the Buyer, or any such associated company, enters into an arrangement or composition with its creditors, or any similar appointment, arrangement or composition is made under any applicable law, or if the Seller has reason to anticipate any such appointment, arrangement or composition; or

(b)   the Buyer fails to make any payment due to the Seller under this Agreement or any other agreement with the Seller by the due date; or

(c)   the Buyer fails to take delivery of the oil in accordance with the provisions of this Agreement

9.2 A notice of termination given by the Seller under Section 9.1 above shall be effective on the date it is transmitted to Buyer.

## 10 - ASSIGNABILITY

This Agreement, or any interest herein, shall not be assigned by either Party, voluntarily or involuntarily, without the prior written consent of the other Party, which consent shall not be unreasonably withheld.  However, either Party may assign all, or part, of its interest hereunder to an affiliated company.  For the purposes hereof, an "affiliated company" is one which controls, is controlled by, or is under common control with the assignor and which assumes in writing all of the assignor's obligations under this Agreement.

## 11 – FORCE MAJEURE

11.1   Subject to the application of the other terms and provisions hereof, neither Party shall be liable for demurrage, loss, damage, claims or demands of any nature whatsoever due to delays or defaults in performance under this Agreement caused by acts of God, public enemy, floods, fire, hostilities or war, declared or undeclared; executive or administrative

orders, regulations, restrictions, or acts of any de jure or de facto government, agency of or any person or authority purporting to act for any such government; illegality arising from applicable domestic or foreign laws or regulations; blockades, labor disturbances, strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, breakdown or injury to producing facilities or manufacturing, selling, transportation or storage facilities at the export terminal; expropriation, confiscation, or requisitioning of raw materials; abnormal decline or exhaustion of crude oil production; partial or total interruption, loss or shortage of transportation facilities to or transportation or storage facilities at the export terminal; rationing or allocation, whether imposed by law or by voluntary cooperation of industry at the insistence or request of any de jure or de facto government, agency of or person purporting to act for any such government; election of the government of the country or origin to take royalty oil in kind or to purchase oil for domestic refining; or any other event, whether or not similar to the causes specified above and whether or not reasonably foreseeable, excepting financial, which event is not reasonably within the control of the Party against whom the claim would otherwise be made.

The foregoing causes or events shall also excuse delays or defaults in performance by the Seller when they affect Seller's supplier.

11.2   Whenever a Party has reason to believe that an event of Force Majeure may occur, or has occurred, that Party shall notify the other in writing as soon as practicable, but in no case later than forty eight (48) hours after the occurrence of the Force Majeure event and shall take all reasonable steps to avoid any delay or interruption in its performance under this Agreement.  Notwithstanding the foregoing, nothing shall relieve the Buyer of the obligation to make timely payment required hereunder for oil sold and delivered under this Agreement and for all other amounts then due to the Seller from the Buyer hereunder.

11.3   If any of the events enumerated above occur, the Seller shall not be required to allocate or prorate its customers, including the Buyer, the supply of oil which the Seller has available at the time of the event, and for the duration of such event, and the Seller can withhold, reduce or suspend deliveries of the oil hereunder to the extent the Seller, in its sole discretion, may determine.  No curtailment, apportionment or suspension of sales shall operate to extend the term of this Agreement.  Such event shall not authorize termination of this Agreement, unless provided otherwise herein.

## 12 - NOTICES

All notices and other communications required to be given hereunder shall be sufficient if sent by letter, telegraph, telex, facsimile machine or cable to the address of the Party specified below.  All notices or statements must be given in writing, or if given orally, must be promptly confirmed in writing.  Notices given by letter shall be deemed to be given on the day such notice should be delivered in the normal course of business.  Notices sent by telegraph, telex, facsimile machine, or cable shall be deemed to be given on the date such notice is transmitted.  Either Party hereto may from time to time by written notice change its address.

The following addresses shall apply:

Seller:                                                     Buyer:

Occidental Crude Sales, Inc. (International)
C/o Occidental Energy Marketing, Inc.
5 Greenway Plaza, Suite 2400
Houston, Texas  77046
Telephone:  (713) 214-7000
Telex:  3787850 OXYCRUDE HOU

Facsimile:  (713) 215-7484

## 13 - NO WAIVER

No waiver by either Party of any breach of any of the covenants or conditions under this Agreement shall at any time release, discharge or prejudice the right of such Party to require strict and full performance by the other Party of any and all provisions hereof.

## 14 – GOVERNING LAW

This Agreement, and any controversies or claims arising out of or relating to the performance of this Agreement, or the breach thereof, shall be governed by the laws of the State of Texas, U.S.A.  The Uniform Law for International Sales under the 1980 United Nations Convention shall have no application to this Agreement in any manner.

## 15    HEADINGS NOT CONTROLLING

The headings herein are for convenience only and shall not control or affect the meaning of any provision of this Agreement.

## 16 – LETTER OF INDEMNITY

Seller shall only be responsible to use reasonable efforts to obtain and promptly pass on the shipping documents applicable to any cargo of oil delivered hereunder.  In the event original bills of lading or other usual shipping documents are not available and presented to the Buyer on or before payment due date, the Buyer agrees to pay the Seller for such cargo upon presentation of a telexed commercial invoice and the Seller's letter of indemnity for the missing documents.

## 17  - CONFLICT OF TERMS

In the event that there is a conflict between the terms and provisions of the sales confirmation documents relating to a particular transaction and these General Terms and Conditions as incorporated therein, the former shall control and prevail.

## 18  - DEFINITIONS

In this Agreement (as hereinafter defined), unless the context otherwise requires, the following terms shall have the following meanings:

(a)    "this Agreement" means these General Terms and Conditions together with any form of agreement into which they are incorporated;

(b)    "agreed loading range" means that period of three (3) consecutive days, as confirmed by the Seller to the Buyer, within which a vessel is to load a cargo of oil hereunder;

(c)    "barrel" means 42 U.S. standard gallons at 60° Fahrenheit;

(d)    "Party" means either the Buyer or the Seller, as the context may require;

(e)    "TBN" (to be named), as used in the vessel nomination procedure hereunder, means the name of a vessel of which the Buyer is to notify the Seller at a later date.

(f)    "U.S." or "U.S.A." means the United States of America

**END**